ROBBINS LLP
BRIAN J. ROBBINS (190264)
brobbins@robbinsllp.com
ASHLEY R. RIFKIN (246602)
arifkin@robbinsllp.com
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BUD & SUE FRASHIER FAMILY TRUST U/A DATED 5/5/98, Derivatively on Behalf of DEXCOM, INC., <br><br> Plaintiff, <br><br> v. <br><br> JACOB S. LEACH, KEVIN R. SAYER, JEREME M. SYLVAIN, SEAN CHRISTENSEN, MARK G. FOLETTA, NICHOLAS AUGUSTINOS, STEVEN R. ALTMAN, RICHARD A. COLLINS, BRIDGETTE P. HELLER, KYLE MALADY, RIMMA DRISCOLL, RENÉE GALA, BARBARA E. KAHN, ERIC J. TOPOL, and KAREN DAHUT, <br><br> Defendants, <br><br> -and- <br><br> DEXCOM, INC., a Delaware Corporation, <br><br> Nominal Defendant. | No. **'26 CV 1852 AGS SBC** <br><br> VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, AND UNJUST ENRICHMENT <br><br><br><br><br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

Plaintiff, by its attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Law, Breach of Fiduciary Duty, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1. This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant full name of DexCom, Inc. ("DexCom" or the "Company") against certain of its officers and directors for violations of securities law, breach of fiduciary duty, and unjust enrichment and violations of law. These wrongs resulted in significant damages to DexCom's reputation, goodwill, and standing in the business community, as well as exposing the Company to potential liability for violations of state and federal law.

2. DexCom is a medical device company headquartered in San Diego, California, that develops, manufactures, and sells continuous glucose monitoring ("CGM") systems used by patients with diabetes to monitor blood glucose levels. The Company's primary products include the DexCom G6 and DexCom G7 CGM systems, which are regulated medical devices subject to approval and oversight by the U.S. Food and Drug Administration ("FDA").

3. During the relevant period, the Individual Defendants (as defined herein) repeatedly represented to investors, regulators, and the public that DexCom's CGM systems were safe, accurate, reliable, and in compliance with applicable regulatory requirements. In truth, the Company had implemented unapproved design and manufacturing changes to the G6 and G7 sensors and had failed to maintain adequate quality-control and corrective-action procedures required under

- 1 -

FDA regulations.

4.    Instead of promptly disclosing these material facts, the Individual Defendants continued to mislead investors.  During this period, the Company repurchased over $906.9 million of its own stock at artificially inflated prices.  Additionally, while the Company's stock price was artificially inflated, certain insiders sold over $17.4 million worth of their personally held DexCom stock while knowing the truth about DexCom's FDA violations and revenue and growth prospects.

5.    The truth gradually emerged between July 2024 to September 2025 through a series of disclosures, including regulatory warnings, product-related announcements, and disappointing financial results.  On July 25, 2024, DexCom reported lower-than-expected revenue for the second quarter of 2024 and cut its full-year revenue forecast.  The Individual Defendants attributed these disappointing results to problems related to its CGM products, including the G7.  On this news, DexCom's stock price fell $43.85 per share, or 40.66%, to close at $64 per share on July 26, 2024, a $17.1 billion loss in market capitalization.

6.    On March 7, 2025, DexCom disclosed that it had received a warning letter (the "Warning Letter") from the FDA related to concerns about manufacturing processes and quality management systems at its facilities.  This was especially troubling since DexCom's customers rely on the Company's products' quality and reliability for the customers' health.  On this news, DexCom's stock price fell $37.59 per share, or 34.8%, to close at $70.26 per share on March 11, 2025, a $14.7 billion loss in market capitalization.

7.    On March 25, 2025, the FDA published the Warning Letter on its website.  The FDA revealed that that DexCom had "adulterated" its G6 and G7 products by "modif[ying] the G6 and G7 sensors" without prior regulatory approval, thereby subjecting the devices to "larger inaccuracies" that "cause higher risks for users who rely on the sensors to dose insulin or make other diabetes treatment

decisions."  On this news, DexCom's stock price fell $5.81 per share, or 7.9%, over three trading days, to close at $67.74 per share on March 28, 2025, a $2.2 billion loss in market capitalization.

8.    On September 18, 2025, Hunterbrook Media, an investigative news outlet, issued a report (the "Hunterbrook Report") describing accuracy problems with DexCom's G7 device which have resulted in serious medical problems for patients.  The Hunterbrook Report stated that "G7 users have been hospitalized and died."  On this news, DexCom's stock price fell $8.99 per share, or 11.8%, over two trading days to close at $67.45 per share on September 19, 2025, a $3.5 billion loss in market capitalization.

9.    As a result of the Individual Defendants' wrongdoing, the Company now faces increased scrutiny from the FDA.  In addition, DexCom patients have brought multiple consumer class actions alleging that DexCom sold them a product that should not have been available for sale in the market as an FDA cleared device, which was inferior in quality to the product as warranted, advertised, and marketed by DexCom, and which did not perform as warranted, advertised, marketed by the Company.  There are several cases already filed in the U.S. District Courts for the Southern District of New York and the Southern District of California.  The Company is likely to experience even more litigation given that millions of patients use DexCom's G6 and G7 products.

10.    Further, as a direct result of this unlawful course of conduct, DexCom is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the Southern District of New York on behalf of investors who purchased DexCom's shares titled *Prime v. DexCom Inc. et al.*, Case No. 1:25-cv-8912 (the "Securities Class Action").

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because plaintiff's claims raise a federal question under sections 10(b) and 20(a) of

the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), 78t(a), and 78t-1, and SEC Rule 10b-5 (17 C.F.R §240.10b-5) promulgated thereunder. This Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

12. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

13. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

14. Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to DexCom, occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

15. Plaintiff Bud & Sue Frashier Family Trust U/A Dated 5/5/98 was a stockholder of DexCom at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current DexCom stockholder.

**Nominal Defendant**

16. Nominal defendant DexCom is a Delaware corporation with principal executive offices located at 6340 Sequence Drive, San Diego, California. The

Company is a medical device company primarily focused on the design, development, and commercialization of CGM systems for the management of diabetes and metabolic health by patients, caregivers, and clinicians around the world. DexCom received approval from the FDA and commercialized its first product in 2006. The Company launched its latest generation system, the Dexcom G7, in 2023. In August 2024, the Company launched Stelo, a biosensor designed for adults with prediabetes and Type 2 diabetes who do not use insulin. Finally, DexCom released its Dexcom G7 15 Day in late 2025. As of December 31, 2025, DexCom had 11,100 employees around the world.

**Defendants**

17.    Defendant Jacob S. Leach ("Leach") has been DexCom's President, Chief Executive Officer ("CEO") and a director since January 2026. Defendant Leach was also DexCom's President and Chief Operating Officer from May 2025 to January 2026; Executive Vice President and Chief Operating Officer from August 2022 to May 2025; Executive Vice President, Chief Technology Officer from October 2018 to August 2022; Senior Vice President of Research and Development from January 2015 to October 2018; Vice President of Research and Development from January 2011 to January 2015; Senior Director of Research and Development from February 2010 to January 2011; Director of Research and Development from September 2008 to February 2010; Manager of Hardware Engineering from January 2007 to February 2010; and Senior Electrical Engineer from March 2004 to January 2007. Defendant Leach is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act. DexCom paid defendant Leach the following compensation as an executive:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2024 | $682,498 | $5,229,163 | $10,610 | $5,922,271 |

18.    Defendant Kevin R. Sayer ("Sayer") has been DexCom's Executive Chairman of the Board of Directors (the "Board") since March 2026 and a director since November 2007.   He was also DexCom's CEO from January 2015 to September 2025; Chairman of the Board since July 2018 to September 2025; President since June 2011 to May 2025; and Chief Operating Officer from January 2013 to January 2015.   Defendant Sayer is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.   While in possession of material, nonpublic information concerning DexCom's true business health, defendant Sayer sold 100,965 shares of his personally held Company stock for $13,678,301.84 in proceeds.   DexCom paid defendant Sayer the following compensation as an executive:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2024 | $1,157,254 | $14,536,111 | $135,432 | $15,828,797 |

19.    Defendant Jereme M. Sylvain ("Sylvain") has been DexCom's Chief Financial Officer ("CFO") since March 2021, and Chief Accounting Officer since March 2020.   He was also DexCom's Senior Vice President, Finance from March 2020 to March 2021, and Vice President of Finance and Corporate Controller from September 2018 to March 2021.   Defendant Sylvain is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.   While in possession of material, nonpublic information concerning DexCom's true business health, defendant Sylvain sold 18,687 shares of his personally held Company stock for $1,531,474.35 in proceeds.   DexCom paid defendant Sylvain the following compensation as an executive:

- 6 -

| Year | Salary | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2024 | $609,323 | $5,229,163 | $12,626 | $5,851,112 |

20. Defendant Sean Christensen ("Christensen") has been DexCom's Senior Vice President, Finance and Investor Relations since March 2026. He was also DexCom's Vice President, Finance and Investor Relations from September 2022 to March 2026; Senior Director, Investor Relations and Corporate FP&A from June 2021 to September 2022; Director of Corporate Affairs and Head of Investor Relations from March 2020 to June 2021; Senior Investor Relations Manager from November 2018 to March 2020; and Intern, Investor Relations and Corporate Development from May 2018 to October 2018. Defendant Christensen is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.

21. Defendant Mark G. Foletta ("Foletta") has been a director since November 2014. He was also DexCom's Interim Chairman of the Board from September 2025 to March 2026. Defendant Foletta has been the Chair and a member of DexCom's Audit Committee since at least April 2024. While in possession of material, nonpublic information concerning DexCom's true business health, defendant Foletta sold 14,250 shares of his personally held Company stock for $1,387,753.11 in proceeds. DexCom paid defendant Foletta the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2024 | $388,066 | $388,066 |

22. Defendant Nicholas Augustinos ("Augustinos") has been a DexCom director since November 2009. He has been the Chair and a member of DexCom's Nominating and Governance Committee since at least April 2024. While in possession of material, nonpublic information concerning DexCom's true business

health, defendant Augustinos sold 6,290 shares of his personally held Company stock for $517,906.02 in proceeds. DexCom paid defendant Augustinos the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
| --- | --- | --- |
| 2024 | $341,728 | $341,728 |

23.    Defendant Steven R. Altman ("Altman") has been a DexCom director since November 2013. He has been a member of DexCom's Nominating and Governance Committee since at least April 2024. DexCom paid defendant Altman the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
| --- | --- | --- |
| 2024 | $431,075 | $431,075 |

24.    Defendant Richard A. Collins ("Collins") has been a DexCom director since March 2017. He has been a member of DexCom's Audit Committee since at least April 2024, and a member of the Nominating and Governance Committee since at least April 2024. DexCom paid defendant Collins the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
| --- | --- | --- |
| 2024 | $343,555 | $343,555 |

25.    Defendant Bridgette P. Heller ("Heller") has been a DexCom director since September 2019. While in possession of material, nonpublic information concerning DexCom's true business health, defendant Heller sold 3,352 shares of her personally held Company stock for $285,176.16 in proceeds. DexCom paid defendant Heller the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
| --- | --- | --- |
| 2024 | $341,728 | $341,728 |

26.    Defendant Kyle Malady ("Malady") has been a DexCom director since October 2020.  He has been the Chair of DexCom's Technology Committee since at least March 2026, and a member of the committee since at least April 2024.  Defendant Malady was also a member of DexCom's Nominating and Governance Committee from at least April 2024 to at least March 2025.  DexCom paid defendant Malady the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2024 | $341,075 | $341,075 |

27.    Defendant Rimma Driscoll ("Driscoll") has been a DexCom director since August 2023.  She has been a member of DexCom's Audit Committee since at least April 2024, and a member of the Technology Committee since at least April 2024.  DexCom paid defendant Driscoll the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2024 | $343,555 | $343,555 |

28.    Defendant Renée Galá ("Galá") has been a DexCom director since March 2025.  She has been a member of DexCom's Audit Committee since May 2025.

29.    Defendant Barbara E. Kahn ("Kahn") was a DexCom director from April 2011 to May 2024.  She was a member of DexCom's Audit Committee from at least April 2024 to May 2024.

30.    Defendant Eric J. Topol ("Topol") was a DexCom director from July 2009 to May 2025.  Defendant Topol was the Chair and a member of DexCom's Technology Committee from at least April 2024 to at least March 2025.  DexCom paid defendant Topol the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2024 | $341,728 | $341,728 |

- 9 -

31.     Defendant Karen Dahut ("Dahut") was a DexCom director from August 2020 to May 2025.  She was a member of DexCom's Technology Committee from at least April 2024 to May 2025.  DexCom paid defendant Dahut the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2024 | $341,075 | $341,075 |

32.     The defendants identified in ¶¶17-20 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶17-18, 21-31 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶21, 24, 27-29 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶26-27, 30-31 are referred to herein as the "Technology Committee Defendants."  The defendants identified in ¶¶22-24, 26 are referred to herein as the "Nominating and Governance Committee Defendants."  The defendants identified in ¶¶18-19, 21-22, 25 are referred to herein as the "Insider Selling Defendants."  Collectively, the defendants identified in ¶¶17-31 are referred to herein as the "Individual Defendants."

**Non-Parties**

33.     Non-party Euan Ashley ("Ashley") has been a DexCom director since October 2025.

34.     Non-party Albert F. Osterloh, IV ("Osterloh") has been a DexCom director since February 26, 2026.

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

**Fiduciary Duties**

35.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe DexCom and its stockholders' fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage DexCom in a fair, just, honest, and equitable

- 10 -

manner. The Individual Defendants were and are required to act in furtherance of the best interests of DexCom and not in furtherance of their personal interest or benefit.

36. To discharge their duties, the officers and directors of DexCom were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of DexCom were required to, among other things:

(a) conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(b) remain informed as to how DexCom conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

37. The Individual Defendants, because of their advisory, executive, managerial, and directorial positions of control and authority, were able to and did, directly or indirectly, exercise commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took part in, or substantially, assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and in furtherance of the wrongdoing.

38. Additionally, the Individual Defendants are required to adhere to the Company's Code of Business Conduct and Ethics (the "Code"). DexCom's Code states that the Company must ensure that any books and records are "complete,

accurate, honest, and submitted in a timely manner." Further, the Company is committed to "timely and accurate reporting to regulators and to maintaining open, honest, and professional relationships with regulators." The Code further requires that DexCom "must also comply with applicable laws, regulations, and accounting practices, as well as internal policies and procedures." The Code states that the Company's "success depends upon every Employee's commitment to following these laws and regulations." The Code also states that "[a]ll such conduct must be compliant with applicable laws, regulations, and internal Dexcom policies while remaining consistent with customary and prudent business practices." The Code also prohibits insider trading stating, "Insider trading is strictly prohibited. Never purchase or sell, either directly or through another person, any type of security while you are aware of material, non-public information about Dexcom or other companies."

**Breaches of Duties**

39. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of DexCom, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

40. The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to: (i) engage in insider trading; (ii) repurchase DexCom stock at artificially inflated prices; (iii) make materially false and misleading statements, and (iv) degrade the accuracy and reliability of DexCom's products, improper practices that wasted the Company's assets, and caused DexCom to incur substantial damage.

41. The Individual Defendants, because of their positions of control and authority as officers and/or directors of DexCom, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The

- 12 -

Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, DexCom has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

42. In addition to these duties, under its Charter, the Audit Committee Defendants, defendants Foletta, Collins, Driscoll, Galá, and Kahn, owed specific duties to DexCom to assist the Board in overseeing statements concerning the Company's products. In particular, the Audit Committee's Charter requires the Audit Committee to oversee the Company's financial statements, accounting and financial reporting processes and system of internal controls over financial reporting of the Company and its audits, and the risk management process. Moreover, the Audit Committee's Charter listed additional responsibilities of the Audit Committee, stating:

> • oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company;
>
> • oversee the periodic reviews of the adequacy of the accounting and financial reporting processes and systems of internal control that are conducted by the Company's independent auditors, the Company's internal audit department, and the Company's financial and senior management;
>
> \* \* \*
>
> • review with management the Company's major financial risk exposures and the steps management has taken to monitor or mitigate such exposures[.]
>
> \* \* \*
>
> 1. *Review and discuss with management the quarterly results and the type and presentation of information to be included in the Company's related earnings press release prior to distribution to the public*.
>
> 2. *Review and discuss with management and the independent auditors*

- 13 -

*the Company's quarterly and annual financial statements and any report or opinion by the independent auditors, prior to distribution to the public or filing with the Commission*.

\* \* \*

*4. Recommend to the Board whether the annual financial statements should be included in the Company's Annual Report on Form 10-K*.

\* \* \*

6. *Discuss on a general basis the type of information to be disclosed and type of presentation to be made regarding financial information and earnings guidance to analysts and rating agencies*.

7. *Review and discuss with management, the internal audit department, and the Company's independent auditor (i) the adequacy of the Company's accounting and financial reporting processes and systems of internal controls, (ii) any significant deficiencies and material weaknesses in the design or operation of, and any material changes in, internal controls over financial reporting* or (ii) fraud involving management or any employee of the Company with a significant role in the Company's internal controls over financial reporting that are disclosed to the Audit Committee.

\* \* \*

## C. Internal Controls

The Committee will:

1. *Discuss with the Company's management, internal audit department, and the independent auditors the function of the Company's disclosure controls and procedures*.

2. *Discuss with the Company's Chief Executive Officer and Chief Financial Officer their conclusions regarding the effectiveness of the Company's disclosure controls and procedures*.

3. Review any fraud involving management or any employee of the Company with a significant role in the Company's internal controls over financial reporting that are disclosed to the Committee.

4. Discuss with the Company's management (including the principal accounting officer), the internal audit department, and the independent

auditors, the periodic reviews of the adequacy of the Company's accounting and financial reporting processes and systems of internal control, including the adequacy of the systems of reporting to the Committee by each group.

5. Discuss any comments or recommendations of the independent auditors outlined in their annual management letter or internal control reports and approve a schedule for implementing any recommended changes and monitor compliance with the schedule.

6. *Periodically consult with the independent auditors out of the presence of management about internal controls, the fullness and accuracy of the Company's financial statements and any other matters that the Committee or these groups believe should be discussed privately with the Committee*.

7. *Review with management the Company's major financial risk exposures and the steps management has taken to monitor such exposures*, *including the Company's procedures and any 5 related policies, with respect to financial risk assessment and financial risk management*.

8. Maintain procedures for (i) the receipt, retention and evaluation of complaints received by the Company regarding fraud, accounting, internal accounting controls or auditing matters, and (ii) the confidential anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. Review any such complaints and submissions that have been received, including the current status and the resolution if one has been reached.

9. Oversee the activities of the internal audit function within the Company, including its purpose, authority, organization, responsibilities, budget and staffing; and review the scope and performance of the department's internal audit plan, including the results of any internal audits, any reports to management and management's response to those reports.

## D. <u>General</u>

The Committee will:

1. *Review on a regular basis the status of any legal matters that could have a significant impact on the Company's financial statements*.

- 15 -

2. Annually prepare a report to the Company's stockholders for inclusion in the Company's annual proxy statement as required by the rules and regulations of the Commission, as they may be amended from time to time.

3. *Review and reassess the adequacy of the Committee's charter at least annually, and recommend to the Board any changes the Committee determines are appropriate*.

\* \* \*

8. *Review with management major legal and compliance risk exposures as they apply to matters that may impact the financial reporting or risk disclosures of the Company and the steps management has taken to monitor or mitigate such exposures, including the Company's procedures and any related policies with respect to financial risk assessment and management*.

9. *Perform any other activities required by applicable law, rules or regulations, including the rules of the Commission and any exchange or market on which the Company's capital stock is traded, and may perform other activities that are consistent with this charter, the Company's Certificate of Incorporation and Bylaws, and applicable laws, rules or regulations as the Committee or the Board deems necessary or appropriate*.

43. While the Audit Committee Defendants had clear responsibilities with respect to ensuring that there were controls regarding the accuracy of the Company's financial disclosures and the Company's communication with the public, the Audit Committee Defendants failed to fulfill these responsibilities. In fact, the Audit Committee Defendants have gravely harmed the Company by taking part in the publishing of false and misleading statements and omissions of material fact described herein.

**Additional Duties of the Technology Committee Defendants**

44. Under the Technology Committee Charter, the Technology Committee Defendants, defendants Malady, Driscoll, Topol, and Dahut, owed specific duties to DexCom to assist the Board in overseeing product technology and information technology matters. In particular, the Technology Committee Charter requires the

Technology Committee Defendants to:

> 1. ***Review, evaluate and make recommendations to the Board regarding the Company's major technology plans and strategies***, including its research and development activities, ***as well as technical and market risks associated with product development and investment***.

> \*   \*   \*

> 3. ***Monitor and evaluate emerging trends in technology that may affect the Company's strategic plans, including monitoring of overall industry trends***.

> \*   \*   \*

> 5. ***Monitor the Company's progress against program objectives, including revenue, efficiency and product development targets***.

45.     While the Technology Committee Defendants had clear responsibilities with respect to the Company's risks associated with product development, the Technology Committee Defendants failed to fulfill these responsibilities.  In fact, the Technology Committee Defendants have gravely harmed the Company by overseeing the approval of inadequate materials which lowered the accuracy and reliability of DexCom's products.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

46.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

47.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of DexCom, regarding the

- 17 -

Individual Defendants' management of DexCom's operations, including the accuracy and reliability of the G6 and G7 products; (ii) facilitate the Insider Selling Defendants' illicit sale of over $17.4 million of their personally held shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at DexCom and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

48. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and unjust enrichment; and to conceal adverse information concerning the DexCom G6 and G7 products.

49. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company to purposefully or recklessly violate federal regulations and issue materially false and misleading statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

50. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**G6 AND G7 PRODUCTS ARE CRITICAL TO DEXCOM'S OPERATIONS**

51.    DexCom's business depends heavily on its CGM franchise, and its flagship G6 and G7 systems sit at the core of that franchise. Dexcom G6 and G7 are CGMs for managing diabetes, providing real-time data to a smartphone or receiver without finger sticks. The G6 uses a two-piece system with a 10-day wear. The G7 is a smaller, all-in-one, 10-day device featuring a 30-minute warmup, higher accuracy for mean absolute relative difference ("MARD"),[1] and a twelve-hour grace period.

52.    DexCom's Annual Report on Form 10-K for the year ended December 31, 2024 (the "2024 Form 10-K"), filed with the SEC on February 18, 2025, states that the Company launched the G6 in 2018 and the G7 in 2023, identifying those products as its latest-generation CGM systems.

53.    The 2024 Form 10-K further states that DexCom "expect[s] that sales of [its] CGM systems will account for substantially all of [its] product revenue for the foreseeable future," underscoring that the Company's operating performance is overwhelmingly tied to the commercial success of those systems.

54.    DexCom also reported that disposable sensor and related revenue accounted for approximately 95% of total revenue in 2024, compared with approximately 90% in 2023, showing that recurring sales tied to CGM sensor use drive nearly all of the Company's revenue. Consistent with that recurring-revenue model, DexCom told investors that, as its installed customer base grows, it expects to generate an increasing portion of revenue from repeat purchases of disposable sensors. The Company's 2024 revenue growth was driven primarily by increased sales volume of disposable sensors associated with continued growth in its worldwide customer base, including the addition of approximately 500,000 to

---

[1] MARD is a standard metric used to measure the accuracy of CGM devices like Dexcom's G6 and G7. The MARD formula tells you how far off the sensor is, on average, expressed as a percentage.

600,000 net users during 2024.

55.    DexCom's risk disclosures confirm the centrality of G6 and G7, because the Company warned that customers are expected to migrate to next-generation CGM systems and that any inability to commercialize existing or upgraded CGM systems on a wide scale could materially harm its business, financial condition, and results of operations.   DexCom specifically acknowledged that market acceptance of its products depends in substantial part on demonstrating their safety, effectiveness, reliability, cost-effectiveness, and ease of use, meaning that any material defect in the G6 or G7 would directly threaten the Company's revenue and competitive position.

## DEXCOM FAILED TO ADHERE TO FDA REGULATIONS

56.    DexCom's medical devices are subject to extensive and ongoing FDA regulation governing, among other things, product design, development, manufacturing, labeling, distribution, recalls, and post-market oversight.  Both the G6 and G7 are FDA-regulated Class II devices subject to the 510(k) framework, and that changes to such devices may require additional FDA submissions when they significantly affect safety or effectiveness.   The FDA's 510(k) framework is a regulatory pathway used by the FDA to allow certain medical devices to be marketed in the United States.  It comes from section 510(k) of the Federal Food, Drug, and Cosmetic Act (the "FD&C Act"), which requires device manufacturers to notify the FDA before selling a device.  Federal regulations require a new 510(k) submission when a device already in commercial distribution is significantly changed or modified in design, components, materials, manufacturing process, or intended use in a way that could significantly affect safety or effectiveness.

57.    The Company committed multiple violations of law.  DexCom was in violation of: (i) 21 C.F.R. §820.75(b) for failing to establish procedures for monitoring and control of process parameters for a validated process; (ii) 21 C.F.R. §820.75(a) for failing to establish procedures to adequately validate a process whose

results cannot be fully verified by subsequent inspection and test; (iii) 21 C.F.R. §820.30(c) for failing to adequately establish procedures for design input; (iv) 21 C.F.R. §820.30(i) for failing to establish procedures for design changes; (v) 21 C.F.R. §820.30(d) for failing to adequately establish procedures for design output; (vi) 21 C.F.R. §820.30(g) for failing to establish adequate procedures for design validation to ensure that devices conform to defined user needs and intended uses; and (vii) 21 C.F.R. §820.100(a) for failing to establish adequate procedures for corrective and preventive actions.

58.   On March 4, 2025, the FDA issued a Warning Letter to DexCom following inspections of DexCom's facilities in San Diego, California, and Mesa, Arizona.  The FDA concluded that DexCom's G6 and G7 devices were "adulterated" because the methods, facilities, or controls used for their manufacture were not in conformity with Quality System Regulation requirements in 21 C.F.R. Part 820.

59.   The Warning Letter identified multiple alleged Quality System Regulation violations, including failures relating to process controls, design input, design changes, design output specifications, design validation, and corrective and preventive action procedures.  Most notably, the FDA stated that DexCom had modified the G6 and G7 sensors by replacing a critical component material without submitting a new premarket notification, and the agency concluded that the devices were also "misbranded" for that reason.  The FDA further found that DexCom's own studies showed significantly greater variability in the performance of sensors made with the replacement material, and the agency stated that the larger inaccuracies associated with those sensors created higher risks for users who rely on the devices to dose insulin or make other diabetes treatment decisions.

60.   The FDA concluded that DexCom had not shown equivalency sufficient to avoid a new premarket submission and stated that the variability differences could significantly affect the safety or effectiveness of the device, thereby triggering the obligation to submit a new 510(k) before commercial

distribution of the modified sensors.  The Warning Letter also faulted DexCom's design-validation procedures because the Company's hazard analyses for the G6 and G7 did not address risks associated with use of the devices in automated insulin dosing systems, which the FDA noted are commonly used with those products.

61.    In addition, the FDA found DexCom's corrective-and-preventive-action procedures inadequate, citing, among other things, a Corrective and Preventive Action ("CAPA") investigation involving out-of-specification dissolved oxygen content for G6 sensors and concluding that DexCom had not adequately supported its assessment that no further action for impacted product was necessary.[2] DexCom itself disclosed the Warning Letter in a March 2025 Form 8-K (discussed in more detail below), acknowledging that the FDA had cited deficiencies in manufacturing processes and quality management systems at the inspected facilities and warning investors that additional legal or regulatory action could follow if the issues were not resolved to the FDA's satisfaction.

**IMPROPER STATEMENTS**

62.    Beginning January 8, 2024, the Individual Defendants concealed the Company's failure to adhere to FDA regulations.  Specifically, the Individual Defendants failed to disclose that: (i) DexCom had made material design changes to the G6 and G7 unauthorized by the FDA; (ii) these design changes rendered the G6 and G7 less reliable than their prior iterations, presenting a material health risk to users relying on those devices for accurate glucose readings; (iii) these issues subjected DexCom to an increased risk of heightened regulatory scrutiny and enforcement action as well as significant legal and reputational harm; and (iv) based on the foregoing, the Company's CGM sales were negatively impacted.  As a result, the Individual Defendants' statements regarding the reliability, accuracy, safety, and

---

[2] CAPA is a required quality-system process under FDA medical-device regulations used to identify problems, fix them, and prevent them from happening again.  *See* FDA rules (21 C.F.R. §820.100).

functionality of Dexcom's CGMs as well as their financial forecasts were materially false and misleading.

63. On January 8, 2024, defendant Sayer presented at the JPMorgan Healthcare Conference. During the conference, defendant Sayer claimed that G7 is "a great platform." He also called the G7 "the most accurate sensor on the market today and the most accurate sensor that's ever been produced by us."

64. On February 8, 2024, defendants Sayer and Sylvain participated in DexCom's earnings call with analysts and investors to discuss the Company's financial results for the year ended December 31, 2023. During the call, defendant Sayer claimed that "G7 is the most accurate CGM ever launched and the market's reception to G7 has been exceptional. Customers and clinicians have been thrilled with the new form factor, product performance and ease of use." He also attributed G7's success largely to "the accuracy of our sensor." During the same call, defendant Sylvain represented that "the performance in the back half of the year, a lot of that has to do with being the most accurate sensor launching with the G7 form factor." He further stated that "having the most advanced sensor on the market is the driver" in taking market share.

65. That same day, DexCom filed its Annual Report on Form 10-K for the year ended December 31, 2023 (the "2023 Form 10-K"), with the SEC. The 2023 Form 10-K touted the accuracy of the G7 as a competitive advantage, stating that "DexCom G7 is the most accurate CGM cleared by the FDA," and that "the capability to measure very low levels of an electrical signal and to accurately translate those measurements into glucose values is also a unique and distinguishing feature of our technology." Defendants Sayer, Sylvain, Foletta, Altman, Augustinos, Collins, Dahut, Driscoll, Heller, Kahn, Malady, and Topol signed the 2023 Form 10-K.

66. On March 5, 2024, defendant Christensen participated in the Raymond James Institutional Investors Conference. During the conference, defendant

Christensen expressed that the "significant growth" that the Company was expecting in 2024 was based on the "excellent product" that DexCom had in the G7. He told investors that the G7 was the "standard in CGM technology around the world," and "the most accurate CGM that has been cleared by the FDA," which offers "that standard DexCom performance that people have come to expect and trust over the years."

67. On DexCom's April 25, 2024 earnings call with analysts and investors to discuss the Company's financial results for the first quarter ended March 31, 2024, defendant Sayer claimed that the Company's positive momentum since the launch of the G7 "can be directly attributed to our product performance and innovative features." He further stated that the G7 "extended our leadership in sensor accuracy."

68. On June 5, 2024, defendant Sylvain participated in the William Blair Growth Stock Conference. During the conference, defendant Sylvain claimed the G7 was "the most accurate sensor on the market."

69. The above statements were materially false and misleading because the Individual Defendants failed to disclose that DexCom had made material design changes to the G6 and G7 unauthorized by the FDA. Those changes rendered the G6 and G7 less reliable than their prior iterations which subjected DexCom to an increased risk of heightened regulatory scrutiny and enforcement action. This negatively impacted the Company's CGM sales. As a result, the Individual Defendants' statements about the reliability, accuracy, safety, and functionality of their CGMs as well as their financial forecasts were materially false and misleading.

### THE TRUTH BEGINS TO EMERGE

70. Beginning July 25, 2024, the public learned the truth about the Individual Defendants' scheme in a series of disclosures. That day, DexCom reported lower-than-expected revenue for the second quarter of 2024 and cut its full-year revenue guidance. Defendant Sayer attributed these disappointing results to problems related to sales of DexCom CGM products, including the G7. For

example, during a July 25, 2024 earnings call to discuss the Company's financial results for the second quarter ended June 30, 2024, defendant Sayer stated that DexCom was "short a large number of new patients as to where we thought we would be at this point in time." On this news, DexCom's stock price fell $43.85 per share, or 40.6%, to close at $64 per share on July 26, 2024, a $17.1 billion loss in market capitalization.

71. Despite this revelation, the Individual Defendants continued to mislead investors by touting the quality and accuracy of DexCom's CGM products and the success of the G7's rollout. During the July 25, 2024 call, defendant Sayer touted the Company's purported enhancements to the G7, stating, in relevant part: "We've built upon the performance of G7, making it even better. This includes a continuation of our monthly cadence of software updates, which included the second-quarter additions of medication logging and the ability to ingest activity data into our G7 app." During the call, defendant Sylvain touted DexCom's enhancements to the G7, stating: "We continue to see further migration of our customer base from G6 to G7 in the second quarter as we finalize new pump integrations and transition DexCom ONE to the G7 form factor."

72. Also on July 25, 2024, DexCom filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2024 (the "Q2 2024 Form 10-Q"), with the SEC. The Q2 2024 Form 10-Q stated that DexCom's product development activities "are focused on improved performance and convenience" and "enabl[ing] intelligent insulin administration."

73. On October 24, 2024, defendant Sylvain participated in DexCom's earnings call to discuss the Company's financial results for the third quarter ended September 30, 2024. During the call, defendant Sylvain stated: "We've made significant progress in transitioning our installed base to the G7 form factor with new pump integrations. ... This has enabled us to further scale our high-volume manufacturing facilities, which positions us well as we work towards our long-term

cost targets."  On the same call, an analyst asked a question regarding DexCom's competitive advantages.  In response, defendant Sayer stated:

> [W]e serve, several hundred thousand AID [automated insulin delivery] system users right now.  *And the results of those AID systems with our partners have been incredibly good.*  We work very closely with them on a regular basis to talk about the new features we're about to bring on board.  *We update our hardware and our app experience, our interfaces with them on a regular basis to enrich the experiences of their customers, and we believe we do that better than anybody else.*  Over time, our reputation in this market and one of the places we've been always strong is in this type 1 market because that has been where we have had the largest market share advantage for a very long time and *we intend to maintain that through the higher quality of our product.  The accuracy of DexCom is tried and true and proven to these patients.*  I've been to several -- it's kind of diabetes fundraiser season.  I've been to a few fundraiser things that I've seen numerous Omnipod and Tandem users, who are now using G7.  Certainly, the Tandem ones and the Omnipod ones are starting to switch.  Their belief in DexCom and our sensors is incredibly heartwarming and it's very important to see that is a great customer base for us, a*nd we'll continue to serve it the same way we always have.*

74.    Also on October 24, 2024, DexCom filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2024 (the "Q3 2024 Form 10-Q"), with the SEC.  The Q3 2024 10-Q stated that DexCom's product development activities "are focused on improved performance and convenience" and "enabl[ing] intelligent insulin administration."

75.    On January 13, 2025, defendant Sayer participated in the J.P. Morgan Healthcare Conference.  During the conference, defendant Sayer stated that the G7 "is a much better user experience than what we had before with G6."

76.    That same day, DexCom issued a press release which quoted defendant Sayer as touting the Company's differentiated portfolio.  In particular, defendant Sayer stated:

DexCom made key strategic investments in 2024 that steadily progressed throughout the year, leaving us well positioned to capitalize on our growth opportunity ahead. ... We plan to build on these investments in 2025 *by further enhancing our differentiated product portfolio and advocating for greater CGM access globally.*

77.     On February 13, 2025, defendant Leach participated in DexCom's earnings call with analysts and investors to discuss the Company's financial results for the year ended December 31, 2024. During the call, defendant Leach touted G7's capabilities, stating:

*[W]e are always striving to enhance the accuracy and reliability of our sensors. G7 is the most accurate sensor available*, but there's still opportunities to enhance this technology and make it more accurate, more reliable for broader group of users.

And so, even within the G7 platform, *we're still working to further enhance the accuracy of that system*.

78.     On February 18, 2025, DexCom the 2024 Form 10-K with the SEC. The 2024 Form 10-K touted the G7 as "the most accurate CGM cleared by the FDA" with, *inter alia*, a "[p]ersonalized alert schedule [that] immediately warns the user of pending dangerous high and low blood sugar levels," a "[n]ew feature [that] allows for more accurate glucose readings," and an "[a]lert feature intended to predict hypoglycemia before it hits to help avoid dangerous low blood sugar events." The 2024 Form 10-K also represented that the G7 "[a]utomatically sends glucose readings to a DexCom receiver or compatible display device every five minutes" and "is generally consistent with our prior generation CGM systems in its technical capabilities and its indications." Defendants Sayer, Sylvain, Foletta, Altman, Augustinos, Collins, Dahut, Driscoll, Heller, Malady, and Topol signed the 2024 Form 10-K.

79.     Investors continued to learn the truth behind the Individual Defendants' misrepresentations on March 7, 2025. That day, DexCom filed a Current Report on Form 8-K with the SEC, disclosing the Warning Letter that it had received from the FDA, which related to concerns about manufacturing processes and quality

management systems at certain of the Company's manufacturing facilities. Specifically, the disclosure stated:

> On March 4, 2025, *the Company received a warning letter from the [FDA] following inspections of the Company's facilities in San Diego, California, and Mesa, Arizona*. In the warning letter, the FDA cited deficiencies in the response letters sent by the Company to the FDA following the Form 483, List of Investigational Observations (the "Form 483"), which was delivered to the Company *in connection with the inspection of the San Diego facility that occurred from October 21, 2024 through November 7, 2024, and the inspection of the Mesa, Arizona facility that occurred from June 10, 2024 through June 14, 2024*.
>
> *The warning letter describes observed non-conformities in manufacturing processes and quality management system*. The warning letter does not restrict the Company's ability to produce, market, manufacture or distribute products, require recall of any products, nor restrict the Company's ability to seek FDA 510(k) clearance of new products.
>
> The Company takes the matters identified in the warning letter seriously, has already submitted several responses to the Form 483 and is in the process of preparing a written response to the warning letter. The Company intends to continue to undertake certain corrections and corrective actions and will also continue to provide regular updates to the FDA in response to the Form 483. The Company cannot, however, give any assurances that the FDA will be satisfied with its response or as to the expected date of the resolution of the matters included in the warning letter. Until the issues cited in the warning letter are resolved to the FDA's satisfaction, additional legal or regulatory action may be taken without further notice.

80. On this news, DexCom's stock price fell $37.59 per share, or 34.8%, to close at $70.26 per share on March 11, 2025, a $14.7 billion loss in market capitalization.

81. On March 25, 2025, during pre-market hours, the FDA published the Warning Letter on its website, revealing that DexCom had "adulterated" its G6 and G7 products by "modif[ying] the G6 and G7 sensors" without prior regulatory approval. In particular, the FDA stated:

> Our inspection revealed that *the G6 and G7 [CGM] Systems are adulterated* ... because your firm does not have approved applications for premarket approval (PMA) in effect ... or approved applications for an investigational device exemption … The devices are also misbranded ... because your firm introduced or delivered for introduction into interstate commerce for commercial distribution these devices *with major changes or modifications to the devices without*

*submitting a new premarket notification to FDA, as required Specifically, your firm modified the G6 and G7 sensors* by replacing the [redacted] with [redacted] used in the [redacted] [Y]our December 3, 2024, response includes the Sensor Level Performance Equivalency of [redacted] and [redacted], *which shows a significant difference in the standard deviation (SD) of glucose sensitivities between sensors* built with [redacted] and [redacted]. This difference in SD indicates greater clinical performance variation for sensors with [redacted]. *The larger inaccuracies in [redacted]-coated sensors cause higher risks for users who rely on the sensors to dose insulin or make other diabetes treatment decisions.* Therefore, we do not agree your firm has shown equivalency between [redacted] and [redacted] to justify that such a change does not require a new premarket submission. *The variability differences could significantly affect the safety or effectiveness of the device[.]*

82.    On this news, DexCom's stock price fell $5.81 per share, or 7.9%, over three trading days, to close at $67.74 per share on March 28, 2025, a $2.2 billion loss in market capitalization.

83.    Despite the foregoing revelations, the Company's stock price was still artificially inflated. The Individual Defendants' continued misstatements and omissions concerning the G7's reliability, accuracy, and functionality, as well as the true scope and severity of the issues and health risks posed by adulterated G7 devices.

84.    On May 1, 2025, defendant Sayer participated in DexCom's earnings call to discuss the Company's financial results for the first quarter ended March 31, 2025. During the call, defendant Sayer addressed the FDA's Warning Letter, stating:

This letter was related to observations made by the agency following the inspections of our San Diego and Mesa facilities during 2024. We take any FDA recommendations very seriously. So our team immediately began instituting corrective actions to address these observations. While we were disappointed to receive a warning letter, I'm incredibly proud of how our teams have rallied together with a thorough review and response, and we look forward to working together with the FDA to further strengthen our systems and processes.

As one example of our ongoing collaboration with the agency, we were excited to recently announce FDA clearance for our 15 Day DexCom G7 System. This marks another innovation milestone for our DexCom as our 15 Day product advances both wear time and accuracy levels for G7 with performance data demonstrating an MARD of 8.0%, this sets a new bar in the industry in terms of sensor accuracy.

- 29 -

85.    During the call, an analyst asked about the potential negative consequences stemming from the FDA's Warning Letter and DexCom's resolution of the agency's concerns.  In response, defendant Leach assuaged concerns by stating that the Warning Letter "did not restrict" the Company "at all":

> [W]e are basically working to implement a number of process controls. We already did quite a bit after the FDA came in and audited.  ...  The warning letter doesn't restrict submissions and approvals of new technologies, devices and/or it doesn't restrict distribution at all.  Just basically, there's a number of things we have to continue to work with the FDA to ensure we address all their concerns.  So it's a big focus for us and so we've got a number of dedicated resources ensuring that, that is done, ***but it doesn't restrict us at all***.

86.    That same day, DexCom filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2025 (the "Q1 2025 Form 10-Q"), with the SEC. The Q1 2025 Form 10-Q continued to represent that DexCom's product development activities "are focused on improved performance and convenience" and "enabl[ing] intelligent insulin administration."  The Q1 2025 Form 10-Q also purported to warn of risks that "may" or "could" materialize from the deficiencies identified in the FDA's Warning Letter, while simultaneously downplaying the true scope and severity of the same.  In particular, the Q1 2025 Form 10-Q stated:

> In the warning letter, the FDA cited deficiencies in the response letters sent by us to the FDA following the Form 483, List of Investigational Observations that was delivered to us in connection with the inspection of our San Diego facility that occurred from October 2024 through November 2024, and the inspection of our Mesa, Arizona facility that occurred in June 2024.  The warning letter describes observed non-conformities in manufacturing processes and our quality management system.  We take the matters identified in the warning letter seriously and have already submitted responses to the Form 483 and to the FDA warning letter.
>
> *        *        *
>
> The potential effect of the warning letter ... can in some cases be difficult to quantify and ***could*** harm our reputation and cause our product sales and profitability to suffer.  In addition, we believe events that ***could*** be classified as reportable events pursuant to MDR [Medical Device Reporting] regulations are generally underreported by physicians and users, and any underlying problems ***could*** be of a larger magnitude than suggested by the number or types of MDRs filed by us. Furthermore, our key component suppliers ***may*** not currently be or ***may***

not continue to be in compliance with applicable regulatory requirements.

\* \* \*

Later discovery of previously unknown problems with our products, including software bugs, unanticipated adverse events or adverse events of unanticipated severity or frequency, manufacturing problems, or failure to comply with regulatory requirements such as the QSR [Quality System Regulation], MDR reporting, or other post-market requirements *may* result in restrictions on such products or manufacturing processes, withdrawal of the products from the market, voluntary or mandatory recalls (through corrections or removals), fines, suspension of regulatory approvals, product seizures, injunctions, the imposition of civil or criminal penalties, or criminal prosecution.

Plainly, the foregoing risk warnings were generic, catch-all provisions that were not tailored to actual known risks regarding the deficiencies identified in the Warning Letter, much less issues specific to adulterated G7 devices, such as patient injury or death resulting from those devices' inability to reliably provide accurate glucose readings.

87.     On July 30, 2025, defendant Leach participated in DexCom's earnings call with analysts and investors to discuss the Company's financial results for the year ended June 30, 2025.  During the call, defendant Leach stated that "we need to continue to ensure that we are building sensors that are both reliable, accurate and continue to push that boundary because it's so important for the users."  Defendant Leach also assured investors that that "fantastic progress" was made with the FDA's letter, stating:

Things have been going really well with the FDA.  We responded rapidly to the warning letter and their concerns.  And we've been giving them periodic updates.  We've made quite a bit of updates to our processes and documentation, addressing much of what the FDA's concerns were.  And so we still have work to do there, but we've been making fantastic progress there.

88.     That same day, DexCom filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2025 (the "Q2 2025 Form 10-Q"), with the SEC. The Q2 2025 Form 10-Q continued to represent that DexCom's product development activities "are focused on improved performance and convenience" and "enabl[ing]

intelligent insulin administration." The Q2 2025 Form 10-Q also contained substantively the same generic, boilerplate risk warnings as referenced in the Q1 2025 Form 10-Q. These risk warnings were not tailored to actual known risks regarding the deficiencies identified in the Warning Letter, much less issues specific to adulterated G7 devices, such as patient injury or death resulting from those devices' inability to reliably provide accurate glucose readings.

89. On September 3, 2025, defendant Leach participated in the Wells Fargo Healthcare Conference. During the conference, an analyst asked about the G7's reliability and accuracy. In response, defendant Leach stated, "[I]f you look at our metrics, things like warranty replacement, complaint rates, performance of the sensor, accuracy, all of that has continued to improve over time and we haven't seen anything that has changed that trajectory."

90. The above statements were materially false and misleading because the Individual Defendants made them while failing to disclose that: (i) DexCom had made material design changes to the G6 and G7 unauthorized by the FDA; (ii) these design changes rendered the G6 and G7 less reliable than their prior iterations, presenting a material health risk to users relying on those devices for accurate glucose readings; (iii) these issues subjected DexCom to an increased risk of heightened regulatory scrutiny and enforcement action as well as significant legal and reputational harm; and (iv) the Company's CGM sales were negatively impacted. As a result, the Individual Defendants' statements about the reliability, accuracy, safety, and functionality of their CGMs as well as their financial forecasts were materially false and misleading.

## THE TRUTH IS FULLY REVEALED

91. The truth about the problems with DexCom's CGM products was fully revealed on September 18, 2025. That day, the Hunterbrook Report was published, addressing DexCom, titled "DexCom's Fatal Flaws." The Hunterbrook Report

- 32 -

revealed, among other things, that issues and health risks posed by adulterated G7 devices were more severe and widespread than previously disclosed, stating:

> **G7 users have been hospitalized and died:** Billy Sosbe lost his life in June after his G7 gave him incorrect glucose readings. Diana Bates Knight's six-year-old daughter was rushed to the ER when her G7 misread her blood sugar by hundreds of points. Bob Hawkinson passed out behind the wheel when his G7 failed to alert him to dangerously low blood sugar. These aren't isolated incidents. More than a dozen other G7 users interviewed by Hunterbrook said they felt betrayed by a technology that had once been life-changing. According to a law firm investigating the G7 following a recall and FDA warning letter, at least 60 people claim to have been hospitalized and multiple others allege death connected to G7 issues. A Facebook group for G7 problems exploded to more than 58,000 members in just over one year.

92. The Hunterbrook Report found that DexCom had prioritized its margins over safety, citing comments from the Company's former employees. In particular, the Hunterbrook Report stated:

> **DexCom staff say corporate culture put margins over safety, eroding trust in the brand:** Former employees described safety concerns in a rush to launch the G7 to compete with Abbott. Leadership of the team responsible for a component flagged by the FDA had inadequate credentials with a "very low" technical level according to a former scientist. The former senior director of manufacturing at the Company's critical Mesa, Arizona, plant said "DexCom definitely dropped the ball" and "the arrogance of DexCom is really what needed to be reset." Another former executive said DexCom compromised the product trying to "hold on to large revenue margins." Multiple former employees told Hunterbrook the G7's problems are symptomatic of a deeper struggle: an innovative DexCom floundering to keep alive a growth story demanded by Wall Street amid a series of headwinds.

93. The Hunterbrook Report also found that doctors were becoming increasingly concerned with the G7's safety, prompting some to stop recommending the device altogether. In particular, the Hunterbrook Report stated:

> **Doctors raise alarms:** Hunterbrook spoke with endocrinologists across the country. While all reported imperfections with [CGMs] generally, several highlighted issues with the G7 in particular. They noted disproportionate sensor inaccuracies, repeated device failures, connectivity issues, and problems with the adhesive. Two said when they spoke with DexCom representatives, the Company expressed surprise or "didn't know anything," a phenomenon one doctor said was tantamount to "gaslighting." Others told Hunterbrook they have stopped putting patients on the G7 altogether.

94.    In addition, the Hunterbrook Report expanded on the disclosures in the FDA's Warning Letter.  Specifically, the Hunterbrook Report pointed out that the Company knew the materials used in the G7 were inaccurate:

> **DexCom incorporated materials into the G7 that it knew were worse by "every accuracy metric," according to FDA documents:** In December 2023, DexCom switched the coating of G7 sensors from an outsourced material to an in-house formulation.  FDA inspection documents obtained by Hunterbrook show DexCom's internal studies demonstrated the new material could lead to "differences in accuracy" that may affect insulin dosing.  Despite its own tests failing to show equivalence with the original component, DexCom sold the product anyway — without proper regulatory clearance.  The FDA cited DexCom with a violation for making this unauthorized change to a "critical raw ingredient" and declared the devices "adulterated."  Complaints about the G7's accuracy were far greater for devices manufactured after DexCom changed the material in December 2023, according to Hunterbrook's analysis of FDA data.

95.    On this news, DexCom's stock price fell $8.99 per share, or 11.7%, over two trading days to close at $67.45 per share on September 19, 2025, a $3.5 billion loss in market capitalization.

## THE COMPANY FACES NUMEROUS LAWSUITS

96.    In addition to the Securities Class Action, DexCom is being sued by multiple patients in consumer class actions.  In particular, a non-exhaustive list of consumer class actions is shown below:[3]

| Case Details | Date Filed | Court |
|---|---|---|
| *Levens, et al. v. DexCom, Inc.*, No. 3:25-cv-02565 | 09/29/2025 | S.D. Cal. |
| *Estravit v. DexCom, Inc.*, No. 3:25-cv-02845 | 10/22/2025 | S.D. Cal. |
| *Dalora v. DexCom, Inc.*, No. 3:25-cv-03210 | 11/18/2025 | S.D. Cal. |
| *Grisoli, et al. v. DexCom, Inc.*, No. 3:25-cv-03488 | 12/09/2025 | S.D. Cal. |

[3] Collectively, these actions are referred to as the "Consumer Class Actions."

| *Dickinson, et al. v. DexCom, Inc.*, No. 3:26-cv-00102 | 01/08/2026 | S.D. Cal. |
|---|---|---|
| *Chatelain v. DexCom, Inc.*, No. 25STCV30722 | 10/21/2025 | Cal. Super. Ct. |

97.    The Consumer Class Actions allege that DexCom violated the Magnuson Moss Warranty Act, breached express warranties, breached the Uniform Commercial Code implied warranty of merchantability, violated California Civil Code section 1750, violated the California Business and Professions Code §17200, and violated the False Advertising – California Business and Professional Code §17500.  The Consumer Class Actions all center on the FDA's Warning Letter, outlining how G6 and G7 devices (sensors) were adulterated and misbranded because of a design change DexCom implemented to a component used in the resistance layers of the sensors without obtaining FDA clearance.  Such design changes resulted in worse performance in terms of accuracy than the component used in prior G6 and G7 devices.

98.    A consumer class action in the U.S. District Court for the Southern District of California pointed to multiple online complaints by patients.  *See Estravit v. Dexcom, Inc.*, No. 3:25-cv-02845, Complaint, ECF No. 1.  The online complaints detailed how patients were injured because of the products' inaccurate readings, stating:

> • "Thanks G7! My daughter has ketones bc dexcom was telling us she was low/in range but she was really high all night. Then we go to change it in the ER and this happens. What a joke. EDIT we do LOTS of finger pokes. Did one yesterday and it was on point. Not every day in diabetes world is picture perfect. Yes, I should have done one at 1 am but instead treated her for a low that wasn't real. She's been in the 400s for days when sick with Covid and didn't have any ketones." Facebook user: Diana Bates Knight, July 22, 2025.[4]

---

[4]  *See*  https://www.facebook.com/groups/1539517486772872/posts/18170998256 81302/ (last accessed March 18, 2026).

- 35 -

• "The Dexcom G7 sensor is a total joke. I have used 2 different ones in the past week and both are producing higher readings than my manual meter. At this time it is reading 120 more than the manual one. A total waste of money." Reddit user: AffectionateLock6981, 1 year ago.[5]

• "I was convinced by pharmacist @ my GP's office to give the Dexcom G7 a try, … Filled RX., 3 sensors $60. Of the three one failed! That's a 33.3% failure rate!, that's ok in tinkertoys but a medical device? Unacceptable! The remaining two seemed tooperate erratically, wild swings in readings. I occasionally go low at night, but this thing was saying 40??? Lowest I recall being is like 80, so question that reading." Reddit user: Cheebachiefer, 1 year ago.[6]

• "My partner was so excited when he got the G7, but it ended up making his life a living hell. Constant disconnects, insanely inaccurate readings, overall abysmal quality control. We tried literally every little thing to try and get it to work again, but it only got worse. Lost a ton of sleep and so many tears of pain and anger. He ended up moving back to G6 because it was so bad. Even the most recent G6's we've been using have noticeably shot up in quality control issues. Everyday I pray something better comes along because both of us are absolutely over everything Dexcom." Reddit user: Zinogre18, 1 year ago.[7]

• "A Nurse Practitioner inserted my first G7 into my abdomen, it failed today, day 4. I don't know what to do, it is a Sunday here and there is no support from Dexcom. I don't have my glucometer with me and I am pretty stressed." Reddit user: Ojmigm95, 1 year ago.[8]

• "I'm new to diabetes after surgery for pancreatic cancer and I've had 2 of the 3 sensors quit early. The first one quit after 6 days, the next one to fail died after 4 days. I contacted Dexcom and they are sending new units but this is a pretty abysmal track record so far." Reddit user: No_Equal_1312, 1 year ago.[9]

---

[5] *See* https://www.reddit.com/r/dexcom/comments/1fobow6/why_is_dexcom_g7_so_bad/ (last accessed March 18, 2026).

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

• "Been using the G7 for a month or so now and its like they all gave me defective sensors. … it says my blood sugar is extremely low (which isnt true). And now on the 6th day, this is my 4th sensor already that is already defective and I need to replace. …" Reddit user: Marciscus, 1 year ago.[10]

• "Im sorry but this is just not at all my experience. It has been abysmal. Im a pregnant t1d and i am using the g7. It has been insanely inaccurate nearly every single sensor no matter what day I am on in the 10 day window. Being pregnant and trying to function appropriately with this system has been atrocious and I would not recommend it to anyone." Reddit user: Substantial_Pool7747, 1 year ago.[11]

• "I had a reading of 20.7 (328) after 36 hours of insertion (and after several incorrect readings), while the fingerstick measurement showed 13.5 (243). So you would suggest just waiting it out? I find that quite difficult, to be honest. I've had T1 since 1999 and recently switched to the Dexcom G7. I'm experiencing quite a few accuracy issues in the first 48 hours, actually worse than the G6. I opted for the G7 because of the direct-to-watch Apple Watch functionality, and of course, it's much smaller. But it's been a bit disappointing so far…" Reddit user: Romini989, 1 year ago.[12]

• "I put on my first g7 last week, and it failed this morning at 12:30 AM. Not having a great start." Reddit user: tirednoelle, 1 year ago.[13]

• "Dexcom G6 is a defective product. Most devices don't last the 10 days posted. They go into an increasing 'No readings alert' mode which begins after 2-7 days of use. During the increasingly brief periods where they show a read, it is often out of rack, when compared to my meter. Some of the time, it shows extremely low, when a meter stick shows otherwise. At least 4 out of 5 of this garbage behaves in this manner. I've called their customer service lunacy so many times. They

---

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

send me another piece of garbage to replace the preceeding defective device. …" Reddit user: niteflight62, 2 years ago.[14]

• "I had the G7 for one order. Had three consecutive failures, so I sent the rest back and switched back to G6. Since then, now I'm getting more G6 failures and inaccuracies then ever before. I'm using so many strips for calibrations that I'm having to pay out of pocket for them because my insurance won't cover them (three month supplies being used within a month)." Reddit user: PVB0910, 2 years ago.[15]

• "My daughter uses g7. It is so ridiculously far when compared to finger prick! Dexom shows 41, real finger test shows 138. Extremely inaccurate. We've had it tested by nurses, doctors and dexcom is usually about 100 off. And I calibrate." Reddit user: FlounderStatus7647, 2 years ago.[16]

99.    As shown from the complaints above, the accuracy and reliability of the sensors are critical to the products' functions.  The sensors are used by people with diabetes to make treatment decisions, including insulin dosing.  Inaccurate readings can lead to serious health risks, including hypoglycemia, hyperglycemia, organ damage, or hospitalization.  The customers purchased the sensors believing they were accurate and FDA-cleared, but would not have bought them if they knew the truth.  DexCom secretly changed the design of its G6 and G7 sensors without FDA approval, sold the modified devices anyway, continued to advertise them as accurate and FDA-cleared, and thereby misled consumers and put patients at risk.  The Company is likely to face even more litigation concerning the sensors.

**DIRECTOR DEFENDANTS CAUSED DEXCOM TO REPURCHASE ITS OWN STOCK AT ARTIFICIALLY INFLATED PRICES**

100.    Despite their knowledge, or reckless disregard for, the Company's growth prospects, the Board approved substantial stock repurchases at artificially

---

[14] *See* https://www.reddit.com/r/dexcom/comments/1bzvph9/dexcom_g7_with_a _70_failure_rate_in_2024_thus_far/ (last accessed March 18, 2026).
[15] *Id*.
[16] *Id*.

- 38 -

inflated prices. In July 2024, the Board approved a share repurchase program for up to $750 million. During May 2025, the Board approved a new share repurchase program for another $750 million. These programs authorized the Company to repurchase up to $1.5 billion of its outstanding common stock utilizing a variety of methods including open-market transactions or privately negotiated transactions.

101. While the price of DexCom's stock was inflated due to the false and misleading statements by the Individual Defendants, the Director Defendants caused DexCom to repurchase 12,429,296 shares of its own common stock for a total of $906,979,917 before the truth fully emerged. Given that the price of DexCom stock was $67.45 per share after the disclosures on September 17, 2025, the true value of the repurchased shares was roughly $838,356,015.20. Accordingly, the Company overpaid $68,623,901.36 to repurchase these shares.

## INSIDER SALES BY INSIDER SELLING DEFENDANTS

102. Rather than providing the market with correct information, the Insider Selling Defendants, defendants Sayer, Sylvain, Foletta, Heller, and Augustinos, used their knowledge of DexCom's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated. As officers and directors of DexCom, the Insider Selling Defendants were privy to material, nonpublic information about the Company's true business health.

103. While in possession of material, nonpublic information, defendant Sayer sold 100,965 shares of his personally held DexCom stock for proceeds of $13.6 million. His sales were timed to maximize profit from DexCom's then artificially inflated stock price. Defendant Sayer's sales are suspicious given that his stock sales represented 16.66% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 327,457 |
| Shares Sold During the Sales Period ("SP") | 100,965 |
| Shares Disposed (Other) During SP | 132,857 |
| Total Shares Held During SP | 605,851 |
| Shares Remaining SP | 372,029 |

- 39 -

| Total Proceeds from Sales | $13,678,301.84 |
|---|---|
| % of Total Ownership Sold During SP | 16.66% |

104.    While in possession of material, nonpublic information, defendant Sylvain sold 18,687 shares of his personally held DexCom stock for proceeds of $1.5 million.  His sales were timed to maximize profit from DexCom's then artificially inflated stock price.  Defendant Sylvain's sales are suspicious given that his stock sales represented 11.12% of his holdings as demonstrated by the table below:

| Total Shares Before Sales | 70,068 |
|---|---|
| Shares Sold During SP | 18,687 |
| Shares Disposed (Other) During SP | 30,721 |
| Total Shares Held During SP | 168,065 |
| Shares Remaining SP | 118,657 |
| Total Proceeds from Sales | $1,531,474.35 |
| % of Total Ownership Sold During SP | 11.12% |

105.    While in possession of material, nonpublic information, defendant Foletta sold 14,250 shares of his personally held DexCom stock for proceeds of $1.3 million.  His sales were timed to maximize profit from DexCom's then artificially inflated stock price.  Defendant Foletta's sales are suspicious given that his stock sales represented 20.04% of his holdings as demonstrated by the table below:

| Total Shares Before Sales | 62,398 |
|---|---|
| Shares Sold During SP | 14,250 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 71,102 |
| Shares Remaining SP | 56,852 |
| Total Proceeds from Sales | $1,387,753.11 |
| % of Total Ownership Sold During SP | 20.04% |

106.    While in possession of material, nonpublic information, defendant Augustinos sold 6,290 shares of his personally held DexCom stock for proceeds of $517,906.  His sales were timed to maximize profit from DexCom's then artificially

- 40 -

inflated stock price. Defendant Augustinos' sales are suspicious given that his stock sales represented 14.06% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 37,083 |
| Shares Sold During SP | 6,290 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 44,747 |
| Shares Remaining SP | 38,457 |
| **Total Proceeds from Sales** | **$517,906.02** |
| **% of Total Ownership Sold During SP** | **14.06%** |

107. While in possession of material, nonpublic information, defendant Heller sold 3,352 shares of her personally held DexCom stock for proceeds of $285,176. Her sales were timed to maximize profit from DexCom's then artificially inflated stock price. Defendant Heller's sales are suspicious given that her stock sales represented 10.68% of her holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 23,731 |
| Shares Sold During SP | 3,352 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 31,395 |
| Shares Remaining SP | 28,043 |
| **Total Proceeds from Sales** | **$285,176.16** |
| **% of Total Ownership Sold During SP** | **10.68%** |

108. In sum, the Insider Selling Defendants sold $17.4 million worth of stock at artificially inflated prices as detailed by the table below:

Sales Period: January 8, 2024 to September 17, 2025

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| SAYER Former President, Chief Executive Officer, Chairperson of the Board and a Director | 3/12/2024 | 12,470 | $131.47 | $1,639,427.16 |
| | 3/12/2024 | 14,993 | $132.43 | $1,985,570.97 |
| | 3/12/2024 | 20,930 | $133.55 | $2,795,144.99 |
| | 3/12/2024 | 2,939 | $134.07 | $394,022.62 |
| | 4/8/2024 | 27,272 | $137.96 | $3,762,488.76 |
| | 4/8/2024 | 22,361 | $138.71 | $3,101,647.35 |
| | Total: | 100,965 | | $13,678,301.84 |
| | | | | |
| SYLVAIN | 2/20/2024 | 3,363 | $116.73 | $392,562.99 |
| | 11/15/2024 | 3,500 | $75.51 | $264,285.00 |

- 41 -

| | | | | |
|---|---|---|---|---|
| **Current Executive Vice President and Chief Financial Officer** | 3/10/2025 | 2,670 | $73.22 | $195,489.39 |
| | 3/10/2025 | 3,203 | $74.04 | $237,151.40 |
| | 3/10/2025 | 1,127 | $74.70 | $84,189.49 |
| | 9/2/2025 | 4,824 | $74.17 | $357,796.08 |
| | Total: | **18,687** | | **$1,531,474.35** |
| | | | | |
| **FOLETTA Current Lead Independent Director** | 6/17/2024 | 7 | $115.18 | $806.26 |
| | 6/17/2024 | 2,212 | $117.16 | $259,159.47 |
| | 6/17/2024 | 475 | $117.77 | $55,941.56 |
| | 6/18/2024 | 3,007 | $116.75 | $351,065.15 |
| | 6/18/2024 | 299 | $117.25 | $35,056.40 |
| | 6/16/2025 | 2,750 | $83.13 | $228,604.75 |
| | 7/15/2025 | 2,742 | $85.17 | $233,528.46 |
| | 7/15/2025 | 8 | $86.03 | $688.24 |
| | 8/15/2025 | 2,555 | $81.02 | $207,002.52 |
| | 8/15/2025 | 195 | $81.54 | $15,900.30 |
| | Total: | **14,250** | | **$1,387,753.11** |
| | | | | |
| **HELLER Current Director** | 6/14/2024 | 1,000 | $113.55 | $113,550.00 |
| | 9/16/2024 | 1,000 | $70.00 | $70,000.00 |
| | 12/16/2024 | 1,000 | $76.87 | $76,870.00 |
| | 3/17/2025 | 352 | $70.33 | $24,756.16 |
| | Total: | **3,352** | | **$285,176.16** |
| | | | | |
| **AUGUSTINOS Current Director** | 6/13/2025 | 2,618 | $81.69 | $213,864.42 |
| | 6/13/2025 | 3,672 | $82.80 | $304,041.60 |
| | Total: | **6,290** | | **$517,906.02** |
| | | | | |
| | | | | |
| | Total: | **143,544** | | **$17,400,611.49** |

## DAMAGES TO DEXCOM

109. As a result of the Individual Defendants' improprieties, DexCom disseminated improper, public statements concerning the G6 and G7 sensors. These improper statements have devastated DexCom's credibility as reflected by the Company's almost $23.7 billion, or 47.3%, market capitalization loss.

110. DexCom's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, DexCom's current and potential customers consider DexCom's products' accuracy and reliability. DexCom's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections

disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

111. Dexcom participates in U.S. federal contracting primarily through supplying CGM devices to government health systems. The Company holds federal supply schedule contracts that allow agencies such as the U.S. Department of Veterans Affairs to purchase Dexcom products through government procurement programs. Federal solicitations from Veterans Affairs medical centers have specifically requested Dexcom CGM systems and related supplies, demonstrating direct purchasing relationships with federal facilities. In addition to procurement contracts, Dexcom devices are covered under federal healthcare programs, including TRICARE and Medicare, which creates significant government-funded revenue even when purchases are made through reimbursement rather than direct contracts. Dexcom's filings also state that the Company participates in government chargeback and pricing programs, confirming ongoing business with U.S. government entities. The FDA Warning Letter stated that "*[o]ther federal agencies may take your compliance with the FD&C Act and its implementing regulations into account when considering the award of federal contracts*." Thus, the Individual Defendants have put the Company's U.S. government-related revenue at risk.

112. Further, as a direct and proximate result of the Individual Defendants' actions, DexCom has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement in the Securities Class Action for violations of federal securities laws;

(b)    costs incurred from defending and paying any settlement in the Consumer Class Actions;

(c)    costs incurred from overpaying approximately $68.6 million to repurchase shares; and

- 43 -

(d)   costs incurred from compensation and benefits paid to the defendants who have breached their duties to DexCom.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

113.   Plaintiff brings this action derivatively in the right and for the benefit of DexCom to redress injuries suffered, and to be suffered, by DexCom as a direct result of breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  DexCom is named as a nominal defendant solely in a derivative capacity.

114.   Plaintiff will adequately and fairly represent the interests of DexCom in enforcing and prosecuting its rights.

115.   Plaintiff was a stockholder of DexCom at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current DexCom stockholder.

116.   The current Board of DexCom consists of the following twelve individuals: defendants Leach, Sayer, Altman, Augustinos, Collins, Driscoll, Foletta, Galá, Heller, and Malady, and non-defendants Osterloh and Ashley. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

117.   As alleged above, defendants Sayer, Foletta, Augustinos, and Heller each received a material personal benefit and were unjustly enriched as a result of breaching their fiduciary duties of loyalty.  Specifically:

(a)   Defendant Sayer made over $13.6 million from insider sales.

(b)   Defendant Foletta made over $1.3 million from insider sales.

(c)   Defendant Augustinos made $517,906 from insider sales.

(d)   Defendant Heller made $285,176 from insider sales.

118. As such, demand is futile as to defendants Sayer, Foletta, Augustinos, and Heller because each of them received a material personal benefit from breaching their fiduciary duty of loyalty and were unjustly enriched thereby.

119. Defendants Leach, Sayer, Altman, Augustinos, Collins, Driscoll, Foletta, Galá, Heller, and Malady served as either directors or officers of the Company during either a substantial part or during all of the wrongdoing alleged herein, and each faces a substantial likelihood of liability for their participation in the illicit acts alleged herein, including violations of the Exchange Act, FDA regulations, the FD&C Act, and consumer protection laws. Notably, the FDA inspections of the Mesa, Arizona, and San Diego, California, facilities occurred from June 10, 2024 through June 14, 2024, and October 21, 2024 through November 7, 2024, respectively. These defendants repeatedly and continuously caused or allowed to occur the materially false and misleading statements concerning DexCom's products and the injuries suffered by DexCom's customers. Defendants Leach, Sayer, Altman, Augustinos, Collins, Driscoll, Foletta, Galá, Heller, and Malady also either caused or allowed the Company to sell the inaccurate, unreliable, and non-FDA cleared G6 and G7 sensors to patients who relied on the accuracy of the products for monitoring glucose levels. These actions not only risked the health of DexCom's customers, but have also caused the Company to suffer severe harm (financial and reputational), as set forth herein. This was in violation of (among other things) these defendants' fiduciary duties, as well as the Company's Code.

120. Defendants Leach, Sayer, Altman, Augustinos, Collins, Driscoll, Foletta, Galá, Heller, and Malady's breaches of their fiduciary duties have led to the Securities Class Action, the Consumer Class Actions, and jeopardized the Company's revenue derived from U.S. federal sources. Moreover, defendants Sayer, Foletta, Altman, Augustinos, Collins, Driscoll, Heller, and Malady signed the 2023 Form 10-K. Defendants Sayer, Foletta, Altman, Augustinos, Collins, Driscoll, Heller, and Malady signed the 2024 Form 10-K. Further, defendants Sayer, Foletta,

Augustinos, and Heller face a substantial likelihood of liability for insider trading. Thus, defendants Leach, Sayer, Altman, Augustinos, Collins, Driscoll, Foletta, Galá, Heller, and Malady each faces a substantial likelihood of liability for their acts in connection with these actions and statements, rendering demand upon them futile.

121. Defendants Leach, Sayer, Altman, Augustinos, Collins, Driscoll, Foletta, Galá, Heller, and Malady's breaches of their fiduciary duties exposed DexCom to increased risk and each face a substantial likelihood of liability for failing to oversee the accuracy and reliability of the G6 and G7 products. These products are mission critical to the Company's revenues. As directors, the Board had a duty to oversee the sensors and ensure that they complied with federal law, especially given the importance of the G6 and G7's impacts on customers with diabetes. Defendants Leach, Sayer, Altman, Augustinos, Collins, Driscoll, Foletta, Galá, Heller, and Malady's actions have harmed and risked the health of thousands of customers. The Consumer Class Actions listed herein are a non-exhaustive list of actions against the Company and are only expected to grow and cause more harm to DexCom.

122. Defendants Sayer, Altman, Augustinos, Collins, Driscoll, Foletta, Galá, Heller, and Malady face a substantial likelihood of liability for causing the Company to repurchase its shares at an artificially inflated price. DexCom paid $906.9 million to repurchase 12,429,296 shares between July 2024 and August 2025. As a result, the Company overpaid approximately $68.6 million for repurchased shares.

123. Defendants Foletta, Collins, Driscoll, and Galá, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's disclosure controls. Moreover, the Audit Committee Defendants reviewed and approved the improper press releases

made to the public. Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein. Thus, defendants Foletta, Collins, Driscoll, and Galá face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

124. Defendants Malady and Driscoll, as members of the Technology Committee, caused or allowed the Company to risk the health of its customers. The Technology Committee's Charter provides that it is responsible for overseeing risks associated with product development. Thus, the Technology Committee Defendants were responsible for knowingly or recklessly allowing the G6 and G7 products to use improper designs without FDA clearance. Accordingly, the Technology Committee Defendants breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein. Thus, defendants Malady and Driscoll face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

125. The principal professional occupation of defendant Leach is his employment with DexCom, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above. Accordingly, defendant Leach lacks independence from defendants Sayer, Altman, Augustinos, Collins, Driscoll, Foletta, Galá, Heller, and Malady due to his interest in maintaining his executive position at DexCom. This lack of independence renders defendant Leach incapable of impartially considering a demand to commence and vigorously prosecute this action. As a result, demand is futile as to defendant Leach.

## COUNT I

**Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder**

126. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127. During the period of wrongdoing, the Individual Defendants disseminated or approved false or misleading statements about DexCom, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and defendants' course of conduct artificially inflated the price of the Company's common stock.

128. While the price of the Company's common stock was inflated due to the false and misleading statements made by the Individual Defendants, the Director Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices. The Director Defendants engaged in a scheme to defraud DexCom by causing the Company to repurchase $906.9 million in shares of its own stock at artificially inflated prices.

129. The Individual Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon DexCom in connection with the Company's repurchases of its own stock during the period of wrongdoing.

130. The Individual Defendants, individually and collectively, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) made various false or misleading

statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) made the above statements intentionally or with a severely reckless disregard for the truth; and (iv) employed devices and artifices to defraud in connection with the purchase and sale of DexCom stock, which were intended to, and did: (a) deceive DexCom and its stockholders regarding, among other things, the accuracy and reliability of the G6 and G7 sensors; (b) artificially inflate and maintain the market price of DexCom's stock; and (c) cause DexCom to repurchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known.  Throughout the period of wrongdoing, the defendants were in possession of material, nonpublic information regarding the above.

131.   The Individual Defendants were among the senior management and directors of the Company, and were therefore directly responsible for, and are liable for, all improper statements made during the period of wrongdoing, as stated above.

132.   The Individual Defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misstatements and omissions of material facts set forth in this Complaint were either known to the Individual Defendants or were so obvious that the defendants should have been aware of them.  Throughout the period of wrongdoing, the defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

133.   The Individual Defendants' false or misleading statements and omissions were made in connection with the repurchases of DexCom stock by the Company.

134.   As a result of the Individual Defendants' misconduct, DexCom has and will suffer damages because it paid artificially inflated prices for its own common

stock and suffered losses when the previously undisclosed facts relating to the wrongdoing were disclosed.

135. DexCom would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Individual Defendants' false or misleading statements.

136. As a direct and proximate result of the Individual Defendants' wrongful conduct, the Company suffered damages in connection with the repurchases of DexCom stock during the period of wrongdoing. By reason of such conduct, the Individual Defendants are liable to the Company pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

137. Plaintiff, on behalf of DexCom, has no adequate remedy at law.

## COUNT II

**Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act**

138. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139. The Individual Defendants, by virtue of their positions with DexCom and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of DexCom and officers and directors who made the false and misleading statements alleged herein within the meaning of section 20(a) of the Exchange Act. The Individual Defendants had the power and influence—and exercised that power—to cause DexCom to engage in the unlawful conduct and practices complained of herein.

140. Plaintiff, on behalf of DexCom, has no adequate remedy at law.

## COUNT III

**Against the Individual Defendants for Breach of Fiduciary Duty**

141. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

142. The Individual Defendants owed and owe DexCom fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe DexCom the highest obligation of care and loyalty.

143. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry, causing the Company to engage in the misconduct described herein.

144. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly, recklessly, and for the purpose and effect of artificially inflating the price of the Company's securities.

145. The Individual Defendants failed to correct or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact described herein, rendering them personally liable to the Company for breaching their fiduciary duties.

146. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent its publicly reported financials. The Individual Defendants also engaged in a scheme to violate FDA regulations when they did not obtain clearance from the FDA for material design changes to the G6 and G7 sensors. These actions could not have been a good-faith exercise of prudent business judgment to protect and promote the Company's corporate assets.

147. The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein, which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants failed to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

148. The Insider Selling Defendants breached their duty of loyalty by selling DexCom stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders. The information described above was material, nonpublic information concerning the Company's future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold DexCom common stock.

149. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, DexCom has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

150. Plaintiff, on behalf of DexCom, has no adequate remedy at law.

<u>**COUNT IV**</u>

**Against the Individual Defendants for Unjust Enrichment**

151. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of DexCom. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to DexCom.

153. The Insider Selling Defendants sold DexCom stock while in possession of material, nonpublic information that artificially inflated the price of DexCom

stock. As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

154. Plaintiff, as a stockholder and representative of DexCom, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

155. Plaintiff, on behalf of DexCom, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of DexCom, demands judgment as follows:

A. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violations of law, breach of fiduciary duty, and unjust enrichment;

B. Directing DexCom to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect DexCom and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. a provision to control insider selling;

2. a proposal to strengthen the Board's oversight over FDA regulations and the FD&C Act;

3. a proposal to strengthen the Board's oversight over safety and consumer complaints;

4. a proposal to strengthen the Company's controls over disclosures;

5. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

6. a provision to permit the stockholders of DexCom to nominate at least three candidates for election to the Board; and

7. a proposal to strengthen the Company's controls over risk management, including, but not limited to, risks concerning federal contracts and customer safety;

C. Extraordinary equitable and injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of DexCom has an effective remedy;

D. Awarding to DexCom restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 24, 2026                    ROBBINS LLP
                                         BRIAN J. ROBBINS
                                         ASHLEY R. RIFKIN

- 54 -

/s/Brian J. Robbins
BRIAN J. ROBBINS

5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile (619) 525-3991
E-mail: brobbins@robbinsllp.com
        arifkin@robbinsllp.com

*Attorneys for Plaintiff*

1720607

## **VERIFICATION**

I, Harry B. Frashier, hereby declare as follows:

I am the Trustee of the Bud & Sue Frashier Family Trust U/A Dated 5/5/98, the plaintiff in this action. I have read the verified stockholder derivative complaint on behalf of DexCom, Inc. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 3/21/2026 _____

DocuSigned by:

*Susan Frashier*

116B727D5A0045A...

HARRY B. FRASHIER